UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOANN M. REVILLE,

                Plaintiff,

v.

NIAGARA FRONTIER TRANSPORTATION
AUTHORITY,

                Defendant.

**REPORT AND
RECOMMENDATION**

04-CV-0258A(M)

---

       This case was referred to me by Hon. Richard J. Arcara, in accordance with 28

U.S.C. §636(b)(1), for supervision of all pretrial matters and to hear and report upon dispositive

motions (Dkt. #45).  Before me is the motion of defendant Niagara Frontier Transportation

Authority ("NFTA") for summary judgment (Dkt. #70).  For the following reasons, I recommend

that the motion be GRANTED.

## PROCEDURAL BACKGROUND

       NFTA had previously moved for summary judgment (Dkt. #58). I recommended

that the motion be denied without prejudice, due to NFTA's failure to provide plaintiff with a

Notice to *Pro Se* Litigants, as required by Local Rule 56.2 (Dkt. #67).  After Chief Judge Arcara

adopted my Report and Recommendation, NFTA re-filed its motion with the proper *pro se* notice

(Dkt. #70), and I set a briefing schedule (Dkt. #76).  Despite obtaining several extensions of the

deadline for filing her opposition to the motion (Dkt. ##78, 79, 80), the most recent of which

expired on August 15, 2008, plaintiff has failed to file opposing papers.

However, notwithstanding that failure,  I must determine whether NFTA is entitled to the relief which it seeks, for "even unopposed motions for summary judgment must fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law". D.H. Blair & Co., Inc. v. . Gottdiener, 462 F. 3d 95, 110 (2d Cir. 2006).  Where "the party who fails to respond is acting pro se, some courts undertake a 'duty' to examine other documents filed in the case to determine whether a question of fact remains". 11 Moore's Federal Practice (Third Ed. 2008), §56.10[3][b]. Therefore, in deciding this motion, I will also consider the materials which plaintiff submitted in opposition to NFTA's initial motion for summary judgment (Dkt. #65).

## FACTUAL BACKGROUND

Plaintiff commenced this action on or about April 2, 2004 by filing a *pro se* complaint alleging, *inter alia*, discrimination in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§12101 *et seq.* (Dkt. #1).  Although the complaint contains other claims and defendants (Dkt. #1), plaintiff's only remaining claim is her ADA discrimination claim against the NFTA. All of her other claims were previously dismissed by Judge Larimer (Dkt. #3).

A.      **The Management Representative Position**

Plaintiff was employed  by NFTA for 21 years.  From 1984 through her termination in 2001, plaintiff worked as a Management Representative at the Buffalo Niagara International Airport ("BNIA") (Dkt. #74, Ex. A, Affidavit of William McGee, ¶14). Management Representatives "supplemented the management staff or acted for airport managers

in their absence.  They worked on special projects, were on hand to handle emergencies,

addressed problems relating to terminal operations with BNIA tenants, concession holders,

contractors and patrons . . ." (Id., Ex. B, Affidavit of William Flanagan, ¶6; Exs. E and F).

   Under their collective bargaining agreement, Management Representatives

worked rotating schedules which included day (5:00 - 8:00 a.m. - 1:00 - 4:00 p.m.), afternoon

(4:00 p.m. - 12:00 a.m.), and night (12:00 a.m. -  8:00 a.m.) shifts (Id. at Ex. D, Collective

Bargaining Agreement effective April 1, 1999 - March 31, 2002, §12.03; Exs. E and F

(Management Representatives "must be willing and available to work rotating shifts, weekends

and holidays")).  However, beginning in early 2000, Management Representatives were only

occasionally required to work the night shift (Id., Ex. B, Affidavit of William Flanagan, ¶8).

   The number of Management Representatives assigned to the BNIA varied

between two and six (Id., Ex. C, January 18, 2006 deposition transcript of plaintiff, p. 19).   At

the time of plaintiff's termination, there were only two other Management Representatives (Id.,

p. 20).


**B.**  **Plaintiff's Employment History**

   Plaintiff had a number of performance and conduct issues during her employment

with NFTA, including:

-  June 21, 1987 - Plaintiff received an oral warning for reporting late to her assigned shift (Id., Ex. H).

-  September 6, 1988 - Plaintiff was admonished for not reporting for an assigned work shift due to "forgetfulness" (Id.).

- March 31, 1989 - Plaintiff was disciplined for leaving her job without authorization (Id.).

- August 6, 1996 - Plaintiff was temporarily relieved of her Management Representative duties for disruptive behavior (Id.).

- November 1, 1996 - Plaintiff was relieved of her duties and responsibilities connected with the BNIA Safety Committee (Id.).

- September 30, 1997 - Plaintiff was referred to the NFTA Employee Assistance Program for "numerous complaints regarding [her] attitude toward workers that [she] supervise[d], as well as other employees at BNIA with whom [she] interact[s]" (Id., Ex. I).

In November 1997, plaintiff took a medical leave of absence based upon the recommendation of her psychiatrist, Myong Won Kim, M.D., (Id., Ex. J).[1]  At or about this time, William Flanagan became plaintiff's supervisor, replacing her previous supervisor, Joseph Granville (Id. at Ex. B, ¶¶4-5).  Plaintiff returned to work without restrictions on March 30, 1998 (Id. at Ex. J).

Upon her return to work, plaintiff continued to receive various warnings, including:

- October 29, 1998 - Plaintiff was admonished for insubordination (Id. at Ex. K).

- November 10, 1998 - Plaintiff was cautioned about parking only in authorized areas (Id.).

- January 26, 1999 - Plaintiff received an oral warning for insubordination and cautioned that "any future infractions of this nature will be grounds for further disciplinary action, up to and including termination as stated in the NFTA Policies and Procedures Manual" (Id.).

---

[1]     Although certain documentation relating to the details of plaintiff's medical condition have been filed under seal in the interests of confidentiality, it is not necessary to discuss those details for purposes of this opinion.

- March 11, 1999 - Plaintiff was cautioned about failing to lock a door (Id.).

- July 29, 1999 - Plaintiff was corrected for improperly distributing free parking coupons (Id.).

In October 1999, Mr. Flanagan "began a more formal progressive discipline program with Plaintiff" (Id., Ex. B, ¶15), pursuant to a policy that was set forth in plaintiff's union contract (Dkt. #66, Ex. FF, Article 30 ("The NFTA shall follow a policy of progressive discipline")).  However, plaintiff continued to have various conduct issues, including:

- October 8, 1999 - Plaintiff received verbal counseling about reporting for the wrong shift (Dkt. #74, Ex. L).

- November 5, 1999 - Plaintiff was admonished about removing  her time card and cautioned that "failure to follow established procedures in the future will result in disciplinary action" (Id., Ex. Q).

- November 17, 1999 - Plaintiff was admonished after she attempted to exchange her employer issued cellular telephone without direction or authority.  In the process of exchanging the cellular telephone plaintiff was also absent from her work assignment for an extended period without authorization (Id.).

- November 29, 1999 - Plaintiff received a verbal warning for failing to park in an authorized area (Id.).

- May 15, 2000 - Plaintiff received a verbal warning for reporting for the wrong shift and was cautioned that "[f]ailure to follow standard operating procedure in the future will lead to further disciplinary action, up to and including termination" (Id., Ex. M).

- August 2, 2000 - Plaintiff received a written warning for failing to submit her daily shift reports for approximately three weeks.  Again, plaintiff was cautioned that "[f]ailure to follow standard operating procedure in the future will lead to further disciplinary action, up to and including termination" (Id., Ex. N).

- December 1, 2000 - Plaintiff received a one-day suspension without pay for failing to submit her daily shift reports since November 15, 2000 (Id., Ex. O).

■   February 26, 2001 - Plaintiff received a five-day suspension without pay for her behavior in dealing with a BNIA tenant (Id., Ex. P).

On March 12, 2001, plaintiff took a second medical leave of absence based upon the recommendation of Dr. Kim (Id, Ex. R).  On May 1, 2001 and May 8, 2001, Dr. Kim provided notes indicating that plaintiff was to work the 8:00 a.m. - 4:00 p.m. shift because of her condition (Id., Ex. S).

Plaintiff returned to work later in the month and was permitted to only work the day shift (Id., Ex. B, Affidavit of William Flanagan, ¶20).  Facing protests from the other two Management Representatives who were required to work increased afternoon shifts because of plaintiff's inability to work that shift, Mr. Flanagan advised plaintiff on May 18, 2001 that she would be placed on the regular work rotation commencing on June 24, 2001 (Id., Ex. B, Affidavit of William Flanagan, ¶¶ 21-22; Ex. V).  On May 21, 2001, plaintiff received a memorandum stating that if she was "unable to work the required shifts, [she] will have to return to disability status.  This is based on the minimum requirement of the Management Representative job description that states 'Must be willing and available to work rotating shifts, weekend and holidays' " (Id., Ex. V).

NFTA contends that plaintiff resumed working the regular work rotation on June 24, 2001 without submitting any further materials from Dr. Kim concerning her medical need to avoid working the afternoon shift (Id., Ex. C, January 18, 2006 deposition transcript of plaintiff, pp. 56-57).  Plaintiff was permitted to work day shifts if she was able to trade shifts with the other Management Representatives (Id., Ex. B, Affidavit of William Flanagan, ¶23).  Plaintiff availed herself of this opportunity, working only five afternoon shifts in July and no afternoon

shifts in September prior to her termination  (Id., Ex. A, Affidavit of William McGee, ¶16, Ex. W).[2]


C.      **Plaintiff's Termination**

On September 27, 2001, plaintiff had traded shifts with another Management

Representative to work the day shift (Id., Ex. B, Affidavit of William Flanagan, ¶25; Exs. X and

Y).   However, plaintiff reported for her originally scheduled afternoon shift, claiming that she

had forgotten about the shift change, and was sent home by her supervisor (Id.).  Based upon

plaintiff's disciplinary record and performance history, she was terminated on October 17, 2001

(Id., Ex. B, Affidavit of William Flanagan, ¶¶ 28-30; Ex. Z).

Plaintiff filed a charge of discrimination with the EEOC on April 24, 2002 (copy

attached to the complaint (Dkt. #1)).  On October 16, 2003, the EEOC issued a determination,

finding that:

> "The respondent made reasonable accommodations based on the
> complainant's disability, by retaining her employment during
> disability leaves and by authorizing her to work day shift only
> beyond the respondent's usual rotation system.  The complainant's
> job description required rotation of shifts; due to the respondent's
> limited staffing, to permit the complainant to permanently work
> day shift only would constitute an undue hardship on the
> respondent and other employees.  The complainant was terminated
> for reasons relating to work performance and attendance, after the
> complainant had received prior warnings and suspensions.  The
> evidence does not support a conclusion that there was a nexus
> between the complainants's termination, and the complainant's
> disability and/or her request for accommodation.  The evidence

---

[2]      Plaintiff's time records for August were misplaced or lost (Id., Ex. A, Affidavit of
William McGee, ¶16).

does not support a conclusion that the complainant was unlawfully discriminated against based on her disability" (Id.).

On January 2, 2004, the EEOC issued plaintiff a "right to sue" letter, and this action ensued.


## DISCUSSION AND ANALYSIS


I.      **Summary Judgment Standard**

        The standard to be applied on a motion for summary judgment in this Circuit is well settled. "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party." Ford v. Reynolds, 316 F. 3d 351, 354 (2d Cir. 2003).

## II.    ADA Discrimination Standard[3]

Plaintiff appears to assert two distinct claims of ADA discrimination: first, that she was the subject of a discriminatory discharge, and second, that the NFTA failed to accommodate her disability.[4]

Claims of discrimination under the ADA are subject to the burden-shifting analysis articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc., 198 F. 3d 68, 72 (2d Cir. 1999).  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  If the plaintiff does so, the burden then shifts to the defendant to offer a legitimate, lawful reason for its action.  If the defendant articulates a non-discriminatory reason, "the McDonnell Douglas framework - with its presumptions and burdens - disappear[s], . . . and the sole remaining issue [is] discrimination *vel non*."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142-43 (2000).  "Although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.' " Id.  "In short, the question becomes whether the evidence, taken as a

---

[3]      NFTA argues that plaintiff is not disabled within the meaning of the ADA or the Rehabilitation Act of 1973 (Dkt. #72, p. 4).  However, even reading plaintiff's complaint liberally, it cannot be read as asserting a claim under the Rehabilitation Act, which provides, *inter alia*,  that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance". 29 U.S.C. §794(a).

[4]      Under the ADA, the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee. . . ." 42 U.S.C. §12112(b)(5)(A).

whole, supports a sufficient rational inference of discrimination." Weinstock v. Columbia
University, 224 F. 3d 33, 42 (2d Cir. 2000), cert. denied, 540 U.S. 811 (2003).

"Whether judgment as a matter of law is appropriate in any particular case will
depend on a number of factors.  Those include the strength of the plaintiff's *prima facie* case, the
probative value of the proof that the employer's explanation is false, and any other evidence that
supports the employer's case and that properly may be considered on a motion for judgment as a
matter of law." Reeves, supra, 530 U.S. at 148-49; see Schnabel v. Abramson, 232 F. 3d 83, 90
(2d Cir. 2000) ("The Supreme Court's decision in Reeves clearly mandates a case-by-case
approach, with a court examining the entire record to determine whether the plaintiff could
satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally
discriminated against the plaintiff".).


**III.    Has NFTA Established its Entitlement to Summary Judgment on Plaintiff's
         ADA Discrimination Claim?**

**A.    Is  NFTA entitled to Eleventh Amendment Immunity?**

The NFTA argues that it should be dismissed from the case because as an agency
of the State of New York it enjoys sovereign immunity from suit under the Eleventh Amendment
(Dkt. #72, Point VII).   Plaintiff does not respond to this argument.

There is some authority in this district which supports the NFTA's argument. See
Grant v. Niagara Frontier Transportation Authority, 1996 WL 107116, *1 (W.D.N.Y. 1996)
(Elfvin, J.) ("This Court [previously] held that, pursuant to the Eleventh Amendment . . . the
NFTA was immune from suit under 42 U.S.C. §1983.  While a number of unpublished decisions

in this District have reached contradictory results on this issue, this Court simply notes that the

plaintiff has not presented to this Court a convincing reason for re-visiting its six-year old

decision").

         However, there is also authority to the contrary. <u>See</u> <u>Herzog Contracting Corp. v.</u>

<u>Niagara Frontier Transportation Authority</u>, 1987 WL 4796, *4 (W.D.N.Y. 1987) (Elfvin, J.)

("The composite picture of the NFTA reveals a corporate entity sufficiently autonomous that it

falls outside the intended protection of the Eleventh Amendment"); <u>Weigand v. Niagara Frontier</u>

<u>Transportation Authority</u>, 2004 WL 1570267, *1 (W.D.N.Y. 2004) (Elfvin, J.) ("NFTA is a

separate legal entity over which NYS is not responsible").

         I need not attempt to resolve this conflict, since, for the following reasons, I

conclude that plaintiff's ADA discrimination claim must fail in any event.


    **B.**      **Did Plaintiff Establish a *Prima Facie* Case of Discrimination?**

         "At the summary judgment stage, [plaintiff's] burden is not one of demonstrating

discrimination by a preponderance of the evidence. Rather, [plaintiff] need only establish a

*prima facie* case by producing evidence sufficient to support a reasonable inference of

discrimination". <u>Adams v. Rochester General Hospital</u>, 977 F. Supp. 226, 231 (W.D.N.Y. 1997)

(Feldman, M.J.). "In order to establish a *prima facie* case of discriminatory discharge, a plaintiff

must show that: (1) her employer is subject to the ADA; (2) she suffers from a disability within

the meaning of the ADA; (3) she could perform the essential functions of her job with or without

reasonable accommodation; and (4) she was fired because of her disability." <u>Ryan v. Grae &</u>

<u>Rybicki, P.C.</u>, 135 F. 3d 867, 869-70 (2d Cir. 1998). "Claims asserting the

failure-to-accommodate theory of discrimination must satisfy a variation of the basic prima facie standard." Moss v. The Port Authority of New York and New Jersey, 2006 WL 3392693, *4 (S.D.N.Y. 2006).  Although the first two elements are identical for establishing a *prima facie* claim of discrimination based on a failure to accommodate, such a claim instead requires at steps three and four that plaintiff establish that, with a reasonable accommodation, she could perform the essential functions of the position and that her employer refused to make such an accommodation.  See Bresloff-Hernandez v. Horn, 2007 WL 2789500, *8 (S.D.N.Y. 2007).

NFTA argues that plaintiff cannot establish a *prima facie* case of ADA discrimination under either theory because (1) she is not disabled within the meaning of the ADA (Dkt. #72, Point III(A)), (2) she cannot perform the essential functions of her job with or without a reasonable accommodation (Id., Point III(B)), and (3) NFTA provided her with sufficient accommodations (Id., Point III(C)).

### 1.    Has Plaintiff Established That She Was Disabled?

The ADA defines a "disability" as:

"(A)    a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B)    a record of such an impairment; or

(C)    being regarded as having such an impairment."  42 U.S.C. §12102(2).

The Supreme Court has articulated a three-step approach for determining whether a plaintiff satisfies the first definition of "disability" in the statute.  See Bragdon v. Abbott, 524

U.S. 624, 631 (1998).  I must determine whether plaintiff suffers from a qualifying physical or mental impairment that substantially limits a major life activity. Id., 524 U.S. at 631.

A major life activity is substantially limited when an individual is "unable to perform a major life activity that the average person in the general population can perform", or is "significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §1630.2(j)(1)(i)-(ii).  The terms "major life activity" and "substantially limited" "need to be interpreted strictly to create a demanding standard for qualifying as disabled".  Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002).

For purposes of this motion, NFTA does "not dispute that Plaintiff suffered from a mental impairment" (Dkt. #72, p. 5).  Instead, it argues that plaintiff has not shown that she was "substantially limited" in a "major life activity" (Id.).  "Sleep and work are generally accepted as major life activities." Serow v. Redco Foods, Inc., 187 F. Supp. 2d 47, 50 (N.D.N.Y. 2002). Therefore, the question becomes whether these impairments substantially limit her in the major life activities of sleep and work.  The "determination of whether a person is disabled in the area of work should only be made after it is determined that the person is not disabled in any other major life activity".  Id. at 51 (citing Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999)).

Plaintiff appears to allege that her mental ailments substantially limited her ability to sleep and work (Dkt. #74, Ex. U).  However, plaintiff's medical records do not indicate that her inability to sleep substantially limited her ability to work.  Rather, plaintiff's claim appears to be the reverse, namely that her work affected her ability to sleep, because it interfered with her

sleep cycle (Dkt. #74, Ex. U (Letter from Dr. Kim dated May 8, 2001- "Historically, [plaintiff]

had difficulty working at night, . . . due to reversal in her sleep cycle")).

Plaintiff's claim that her impairment substantially limits her ability to work also

fails.  "When the major life activity under consideration is that of working, the statutory phrase

'substantially limits' requires . . . that the plaintiffs allege that they are unable to work in a broad

class of jobs."  Bogner v. The Wackenhut Corp., 2008 WL 84590, *4 (W.D.N.Y. 2008) (Telesca,

J.).  Plaintiff has failed to establish that she was unable to perform a broad class of jobs.  See

Bogner, supra, 2008 WL 84590 at *4 ("Plaintiff can show only that his epilepsy has affected his

major life activity of working in a job that requires him to work between 10:30 p.m. and 6:30

a.m.  This, at best, demonstrates an inability to work during an 8-hour period at night."); Colwell

v. Suffolk County Police Department, 158 F. 3d 635, 644-45 (2d Cir. 1998), cert. denied, 526

U.S. 1018 (1999) (plaintiff police officer's medical restrictions that he not work "late tours or

rotating shifts" was insufficient to show that he was significantly restricted in his ability to work

at a class or broad range of jobs).


2.      **Has Plaintiff Established that She Could Perform the Essential Functions of her Job With or Without a Reasonable Accommodation?**

Even assuming that plaintiff could establish that she is disabled under the ADA,

she is still required, as part of her *prima facie* case, to demonstrate that she could perform the

essential functions of the position with a reasonable accommodation.

"If an employee is disabled under the ADA, an employer must make reasonable

accommodations to the known physical . . . limitations of an otherwise qualified individual with

-14-

a disability[.]" Bogner, supra, 2008 WL 84590 at *5.   Reasonable accommodations may

include, *inter alia*, "job restructuring, part-time or modified schedules, reassignment to a vacant

position . . . and other similar accommodations for individuals with disabilities." 42 U.S.C.

§12111(9)(B).   However, "a reasonable accommodation can never involve the elimination of an

essential function of a job".   Shannon v. New York City Transit Authority, 332 F. 3d 95, 100 (2d

Cir. 2003).   An essential function "encompasses more than core job requirements; indeed, it may

also include scheduling flexibility".   Rehrs v. The Iams Company, 486 F. 3d 353, 358 (8th Cir.

2007).

        "In determining whether a plaintiff can perform the essential functions of his or

her job, a court must give considerable deference to an employer's judgment regarding what

functions are essential for service in a particular position." Bogner, supra, 2008 WL 84590 at *5.

"The employer's written job description, especially, is given substantial weight." Fleming v.

Verizon New York Inc., 2006 WL 2709766, *17 (S.D.N.Y. 2006).

        NFTA has established that working the afternoon shift on a rotating schedule is

one of the essential functions of the Management Representative's position by introducing

various undisputed evidence, including its own job descriptions, which state that this position

requires that an individual "[m]ust be willing and available to work rotating work shifts,

weekends and holidays" (Dkt. #74, Exs. E and F; see Ex. A, Affidavit of William McGee, ¶10).

"Essentially, plaintiff is making defendant create a new job for [her] . . . . . Such accommodation

is not reasonable since it would permit plaintiff to work shifts different from those of all other

[similarly situated employees].  This not only eliminates an essential function of [plaintiff's]

position but it also creates an entirely new position and imposes an additional burden on

[plaintiff's] co-workers." Bogner, supra, 2008 WL 84590 at *6.

As NFTA points out, its temporary accommodation in May 2001 (permitting

plaintiff to work only day shifts) fails to establish that working afternoon shifts on a rotating

schedule was not an essential function of the Management Representatives's position (Dkt. #72,

p. 11).  " 'Evidence that accommodations were made so that an employee could avoid a

particular task merely shows the job could be restructured, not that [the function] was

non-essential.' " Alenski v. Potter,  2005 WL 1309043, *17 (E.D.N.Y. 2005) (quoting Phelps v.

Optima Health, Inc., 251 F. 3d 21, 26 (1st Cir. 2001)).

Additionally, while Sandra Smith, another Management Representative, was

permitted to work steadily on the afternoon shift for a number of months, this amended schedule

was without objection from plaintiff and the other Management Representatives (Dkt. #74,

Ex. C, January 18, 2006 deposition of plaintiff, pp. 34-35).  Likewise, plaintiff testified that two

other Management Representatives were permitted to work limited shifts for extended periods

under Joseph Granville prior to November 1997 (Id., pp. 31-33).  At that time there were

between four and five Management Representatives, thereby limiting the impact of one

Management Representative working steady shifts (Id., p. 37).  By contrast, at the time of

plaintiff's return from her second disability leave of absence, there were only two other

Management Representatives, both of whom protested her being permitted to work only the day

shift (Id., Ex. B, Affidavit of William Flanagan, ¶21).[5]

---

[5]     Plaintiff argued in her opposition to NFTA's initial motion for summary judgment that
the current Management Representatives do not work rotating shifts (Dkt. #65, Ex. K).  However, she
fails to offer any admissible evidence on this point.  Nevertheless, the current employment relations

Moreover, NFTA argues that removing plaintiff from the rotating schedule for Management Representatives would require it to violate the collective bargaining rights of the other two Management Representatives, absent negotiation with the collective bargaining agent for the Management Representative position (Dkt. #72, Point III (B)(iv); Dkt. #74, Ex. A, Affidavit of William McGee, ¶¶11-12), a fact uncontested by plaintiff.  Because this accommodation would require NFTA to breach the collective bargaining rights of its employees, it is unreasonable *per se*.  See Keck v. New York State Office of Alcoholism and Substance Abuse Services, 10 F. Supp. 2d 194, 202 n. 6 (N.D.N.Y. 2006) ("Defendant suggests that plaintiff's requested accommodation would have been a violation of the collective bargaining rights of the other employees.  If that were the case, the accommodation would be *per se* unreasonable.").

Under these circumstances, I conclude that plaintiff has not established any *reasonable* accommodation not provided to her by NFTA that would have allowed her to perform the essential functions of her job.[6]

### C.    Was NFTA's Reason for Terminating Plaintiff a Pretext for Discrimination?

Even if plaintiff had demonstrated a *prima facie* case of discrimination, NFTA has established a legitimate, non-discriminatory reason for plaintiff's termination, namely the performance and conduct issues during the course of her employment (Dkt. #72, Point IV).  See

_____

between the NFTA and its Management Representatives have no bearing on the state of affairs during the time period relevant to the litigation.

[6]      Therefore, I need not address NFTA's argument that it afforded plaintiff reasonable accommodations for her disability (Dkt. #72, Point III (C)).

-17-

Lees v. The Case-Hoyt Corp., 779 F. Supp. 717, 728 (W.D.N.Y. 1991) (Larimer, J.)  ("An employer has a legitimate business interest in requiring their employees to arrive by a specific time").  Therefore, to survive summary judgment, plaintiff must "show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the *prima facie* case, without more."  Sista v. CDC Ixis North America, Inc., 445 F. 3d 161, 173 (2d Cir. 2006).

Even considering plaintiff's previous submissions, she has set forth no evidence to raise a genuine issue of fact as to whether NFTA's reasons for her termination were false or that her termination was motivated by discrimination.  In fact, plaintiff previously argued that she was terminated because Mr. Flanagan was attempting to eliminate the Management Representative position (Dkt. #65, Document entitled "Background Information", p. 7), rather than because of discrimination.

Plaintiff also makes various contentions concerning the propriety of her hearing before the New York State Division of Human Rights (Id., pp. 2-6), which have no bearing on the motion before me.  Additionally, plaintiff previously argued that she only received limited discovery from defendants relating to the period from 1997 through 2001 (Id.).  However, even accepting plaintiff's argument as a request for a continuance of discovery pursuant to Rule 56(f), I would deny the motion, because plaintiff has been provided a full and fair opportunity to conduct discovery during the several years in which this case has been pending.

-18-

## CONCLUSION

For these reasons, I recommend that the NFTA's motion for summary judgment (Dkt. #70) be GRANTED.  Pursuant to 28 U.S.C. §636(b)(1), it is hereby

ORDERED, that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Rule 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance.  See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co., 840 F. 2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.  Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F. 2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judge's refusal to consider the objection.

**SO ORDERED.**

DATED:   December 10, 2008

JEREMIAH J. MCCARTHY
United States Magistrate Judge